IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:11cr503 |
| ) | |
| NAWAF M. HASAN ) | |

MEMORANDUM OPINION

Following a lengthy undercover investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), defendant Nawaf M. Hasan ("Hasan") was arrested and charged with one count of conspiracy to purchase, possess, transport and distribute contraband cigarettes, in violation of 18 U.S.C. § 371 (Count One), and five substantive counts of purchasing, possessing and transporting contraband cigarettes, in violation of 18 U.S.C. § 2342(a) (Counts Two through Six). By pretrial motion, Hasan sought to dismiss the indictment, or alternatively, to exclude the evidence against him, on the ground that the length and scope of the undercover ATF operation was so outrageous as to constitute a violation of his due process rights. Following the parties' submission of briefs and oral argument, Hasan's motion to dismiss or to exclude evidence was denied. *See United States v. Hasan*, 1:11cr503 (E.D. Va. Jan. 13, 2012) (Order). Recorded here are the reasons underlying that ruling.

I.

To place the matter in context, it is first important to note that each state in the country decides independently whether to tax cigarettes and other tobacco products sold within that state and, if so, the specific amount of that tax. The same is true for local governments. Because the state and local cigarette tax processes are independent of one another, it is not surprising that significant disparities exist across the country in the amount of tax imposed on cigarettes and

[1]

other tobacco products sold from state to state. And regrettably, but also not surprisingly, these disparities have led to a market for the unlawful interstate trafficking of so-called "contraband" cigarettes, or cigarettes "which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found."[1] This is precisely the type of unlawful conduct involved here.

The essential facts pertinent to Hasan's motion are not in dispute and can be succinctly stated. Beginning in 2009, ATF embarked on a lengthy — approximately two years — undercover investigation into the unlawful purchase and distribution of contraband cigarettes along the Eastern Seaboard. The government points out that an undercover operation of this length is necessary in order to allow the government an adequate opportunity to determine the full scope and extent of the subject conspiracy, as well as to identify its various members and determine their respective roles in the unlawful conduct.

Throughout the course of the conspiracy, ATF and other cooperating law enforcement agents engaged in varied investigative tactics and participated in numerous undercover transactions involving the sale of untaxed and unstamped cigarettes to various targets of the investigation, including Hasan. Indeed, the undisputed record reflects that on multiple occasions

---

[1] More specifically, contraband cigarettes are defined generally by statute as

> [a] quantity in excess of 10,000 cigarettes [equivalent to 50 cartons], which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes . . .

18 U.S.C. § 2341(2).

[2]

during the undercover ATF operation, Hasan purchased large quantities of untaxed, unstamped cigarettes from undercover agents in the Eastern District of Virginia. The record is also clear that Hasan, together with several co-conspirators, then transported these contraband cigarettes in interstate commerce for the purpose of later distributing the cigarettes in New York, where the tobacco tax rate is significantly higher than it is in Virginia.[2] The first such undercover transaction occurred on June 4, 2009. On this occasion, Hasan and a co-conspirator purchased 1,500 cartons of untaxed cigarettes from undercover ATF agents in the Eastern District of Virginia, for subsequent distribution in New York.

In the following months, Hasan and his co-conspirators continued to purchase thousands of cartons of untaxed cigarettes from undercover ATF agents and other cooperating law enforcement officers in Virginia, and continued to transport those contraband cigarettes to New York for distribution. On each occasion, Hasan and his co-conspirators paid for the untaxed cigarettes in cash. For example, on August 9, 2009, Hasan purchased 110 cases, or 6,600 cartons, of untaxed cigarettes from undercover agents in exchange for $164,920 in United States currency. Hasan and his co-conspirators purchased more than 27,000 cartons of unstamped, untaxed cigarettes from undercover agents in Virginia and then transported these cigarettes to New York for distribution in that state, thereby depriving the state of New York of more than $1.1 million in applicable tax revenue.

---

[2] Indeed, as of August 2011, New York imposed a tax rate of $4.35 per pack of cigarettes, compared to Virginia's then-applicable tax rate of only $.30 per pack. Thus, based on state taxes alone, criminal enterprises can make a profit of more than $4.00 per pack of cigarettes by engaging in the unlawful trafficking of contraband cigarettes between Virginia and New York. And this potential profit would be even greater if the contraband cigarettes were sold specifically in New York City, which imposes an additional local tax of $1.50 per pack above and beyond the applicable state tax.

Eventually, on April 27, 2011, Hasan and several co-conspirators were arrested in the Eastern District of Virginia, after they had traveled from New York for the purpose of purchasing an additional 15,000 cartons of unstamped, untaxed cigarettes from undercover ATF agents. Hasan was later charged in a six-count federal indictment with one count of conspiracy to purchase, possess, transport and distribute contraband cigarettes, in violation of 18 U.S.C. § 371 (Count One), and five substantive counts of purchasing, possessing and transporting contraband cigarettes, in violation of 18 U.S.C. § 2342(a) (Counts Two through Six). By pretrial motion, Hasan sought to dismiss the indictment in its entirety, or alternatively, to exclude the evidence against him, on the ground that the length and scope of the undercover ATF operation was so outrageous as to constitute a violation of his due process rights.[3] For the reasons that follow, Hasan's motion lacks merit and must be denied.

## II.

The starting point in the analysis is, of course, a brief overview of the law governing due process claims based on allegations of outrageous government conduct. This seldom-addressed category of constitutional violations was first recognized nearly forty years ago in *United States v. Russell*, 411 U.S. 423 (1973). There, the Supreme Court concluded that an undercover law enforcement agent who had been investigating a group of individuals for unlawfully manufacturing methamphetamine did not engage in outrageous conduct by supplying the individuals with a legal, but difficult-to-obtain chemical that was essential to the

---

[3] Hasan also filed related pretrial motions requesting discovery of certain additional factual information related to the undercover ATF investigation at issue — information which he argued was in the sole and exclusive possession of the government — as well as permission to present the testimony of two government agents in support of his motion to dismiss or exclude evidence. Hasan's related motions in this regard were appropriately considered and rejected in the course of the pretrial motions hearing held on January 13, 2012. *See United States v. Hasan*, 1:11cr503 (E.D. Va. Jan. 13, 2012) (Order).

methamphetamine manufacturing process. In reaching this result, the Supreme Court acknowledged that

> [w]hile we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . the instant case is distinctly not of that breed.

*Id.* at 431, 432. Importantly, the *Russell* decision made unmistakably clear that the infiltration of criminal organizations by law enforcement agents, as well as limited participation by those agents in the unlawful conduct under investigation, is a permissible, and thus constitutional, means of investigating and apprehending those engaged in criminal conduct. *Id.* at 432.

Three years after *Russell*, the Supreme Court revisited the issue of outrageous government conduct in *Hampton v. United States*, 425 U.S. 484 (1976). There, the defendant had been convicted of selling a quantity of heroin which, as it happened, had been supplied to the defendant by a government informant and was later sold by the defendant to undercover law enforcement agents. While acknowledging that his predisposition to sell heroin precluded an entrapment defense,[4] the defendant in *Hampton* nonetheless challenged his conviction on the ground that the government's conduct in supplying him with the heroin he was later charged with distributing violated his due process rights. A divided court ultimately rejected the defendant's outrageous government conduct argument, holding essentially that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant." *Hampton*, 425 U.S. at 490. In this regard, the *Hampton* plurality opinion provided the following explanation:

---

[4] *See, e.g., Russell*, 411 U.S. at 433, 436 (recognizing that a defendant's predisposition to commit a crime forecloses the use of an entrapment defense).

[5]

> If the result of the government activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . . the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or local law.

*Id.*, 425 U.S. at 490.

In the years following *Hampton*, courts in this circuit and elsewhere have reaffirmed the principle that a due process violation based on outrageous government misconduct "survives *Hampton* and is available in appropriate circumstances." *United States v. Goodwin*, 674 F. Supp. 1211, 1217 (E.D. Va. 1987). In fact, such due process violations are quite rare. Indeed, the Fourth Circuit has considered the issue on several occasions and has yet to reverse a single conviction or suppress evidence based on allegations of outrageous government conduct.[5] And this is not surprising, for a due process violation such as the one alleged here can be found "only where the official [government] conduct is *outrageous*, not simply offensive." *United States v. Goodwin*, 854 F.2d 33, 37 (4th Cir. 1988) (emphasis added). In harmony with other courts, the Fourth Circuit has consistently defined the phrase "outrageous government conduct" in narrow and restrictive terms, such as "shocking []or offensive to traditional notions of fundamental fairness." *Id.* at 37.[6] And importantly, it is well-settled that "[o]utrageous is not a label properly

---

[5] *See, e.g., United States v. Osborne*, 935 F.2d 32, 35-37 (4th Cir. 1991) (holding that government participation in a child pornography sting did not constitute outrageous government conduct in violation of the Fifth Amendment); *United States v. Chavis*, 880 F.2d 788, 793-94 (4th Cir. 1989) (concluding that the testimony of a paid informant who arranged a three-kilogram purchase of cocaine on behalf of the government was not entitled to suppression on the ground that the government engaged in outrageous government conduct).

[6] *See also Russell*, 411 U.S. at 432 (noting that "[t]he law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment") (citation omitted); *United States*

[6]

applied to conduct because it is a sting or reverse sting involving contraband." *Id.*; *see also Goodwin*, 674 F. Supp. at 1217 (stating that "[g]overnment conduct does not reach this level simply because it is undercover or a reverse sting or because the government supplies an ingredient or even the contraband itself").

These principles, applied here, compel the conclusion that Hasan's motion to dismiss based on alleged outrageous government conduct must be denied. Simply put, and as discussed more fully *infra*, no aspect of the undercover ATF operation at issue here was either "outrageous" or "offensive to traditional notions of fundamental fairness" so as to warrant the extraordinary remedy of dismissal of the indictment. *Goodwin*, 854 F.2d at 37. Nor were the investigatory methods and tactics used by the ATF agents throughout the course of the undercover operation unlawful in any respect, as Hasan contends.

Specifically, a review of the applicable federal regulations makes clear that the ATF has broad discretion to "[i]nvestigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson," including, as involved here, the laws "related to trafficking in contraband cigarettes." 28 C.F.R. § 0.130.[7] Consistent with this, Congress has expressly authorized the ATF to expend appropriated funds, *inter alia*, (i) to conduct undercover investigative operations as are necessary for the detection and prosecution of criminal activity, (ii) to establish and operate business entities as part of such undercover operations, and (iii) to use proceeds from such undercover operations to offset any reasonable expenses incurred in the

---

*v. Haas*, 141 F.3d 1181 (Table), 1998 WL 88550, at *1 (9th Cir. 1998) (stating that "[w]e have characterized outrageous government conduct by various highly restrictive terms, such as 'most narrow,' 'shocking to the universal sense of justice,' 'only the most intolerable government conduct,' and 'slim category'") (citations omitted).

[7] Title 28 U.S.C. § 533 provides, in pertinent part, that "[t]he Attorney General may appoint officials . . . to detect and prosecute crimes against the United States," and one such appointed "official" or agency is, of course, the ATF. 28 U.S.C. § 533(1).

[7]

course of the operations.[8] And here, by engaging in actions expressly authorized by Congress, including specifically the establishment of an undercover "business" of selling untaxed, unstamped cigarettes to Hasan and other targets of the investigation, the ATF agents clearly did not engage in outrageous conduct violative of the Due Process Clause. Put differently, the undercover ATF operation, and the manner in which it was conducted, "was neither shocking, nor offensive to traditional notions of fundamental fairness." *Goodwin*, 674 F. Supp. at 1219; *see also Russell*, 411 U.S. at 432 ("[t]he law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment") (citation omitted).

In an attempt to avoid this result, Hasan makes much of the fact that the undercover ATF agents not only possessed, but also distributed large quantities of untaxed, unstamped cigarettes in this instance and, as Hasan puts it, "let the [cigarettes] walk." Def. Mot. at 2 (stating that "law enforcement was the illegal cigarettes distributor and let the substance walk rather than arrest the buyers on the spot"). By doing so, Hasan contends that the agents themselves engaged in the unlawful trafficking of contraband cigarettes. Hasan is clearly mistaken in this regard. To be sure, the criminal statute pursuant to which Hasan is charged provides that "[i]t shall be unlawful

---

[8] *See* P.L. 102-395, Sec. 102(b) (providing that "with respect to any undercover investigative operations of the Federal Bureau of Investigation or the Drug Enforcement Administration which is necessary for the detection and prosecution of crimes against the United States . . . sums authorized to be appropriated for the Federal Bureau of Investigation and for the Drug Enforcement Administration may be used to establish or to acquire proprietary corporations or business entities as part of an undercover investigative operation, and to operate such corporations or business entities on a commercial basis . . . [and] proceeds from such undercover operation may be used to offset necessary and reasonable expenses incurred in such operation"); P.L. 112-55, Sec. 207 (providing that "Public Law 102-395 section 102(b) shall extend to the Bureau of Alcohol, Tobacco, Firearms and Explosives in the conduct of undercover investigative operations and shall apply without fiscal year limitation with respect to any undercover operation by the Bureau of Alcohol, Tobacco, Firearms and Explosives that is necessary for the detection and prosecution of crimes against the United States").

[8]

for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes . . ..." 18 U.S.C. § 2342. Yet significantly, the statute expressly excludes from the definition of "contraband cigarettes" any cigarettes "which are in the possession of . . . an officer, employee, or other agent of the United States or a State . . . having possession of such cigarettes *in connection with the performance of official duties.*" 18 U.S.C. § 2341(2)(D) (emphasis added). In making this exception, Congress clearly recognized that there might well be occasions, as here, when the official duties of law enforcement officers require those officers to engage in actions that would otherwise violate the statute, namely "to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342. Thus, because the undercover ATF agents possessed and distributed the untaxed, unstamped cigarettes at issue "in connection with the performance of [their] official duties," it necessarily follows, contrary to Hasan's contention, that the agents' possession and distribution of those cigarettes violated neither the specific statute at issue nor any other criminal statute.[9]

Nor does the fact that the agents, as Hasan put it, "let the cigarettes walk," alter the analysis in any respect. Indeed, courts have consistently rejected this argument in situations where even illegal narcotics — as opposed to an otherwise legal commodity such as tobacco cigarettes — were distributed by government agents in the course of an undercover sting operation and not immediately recovered. For example, in *United States v. Santana*, 6 F.3d 1

---

[9] Even so, it is nonetheless important to note that "[a] measure of government illegality is now a well-accepted weapon in the war against crime." *Goodwin*, 674 F. Supp. at 1219 n. 25. Indeed, it is beyond dispute that in connection with their efforts to investigate and apprehend criminals, law enforcement agents may, and often do, engage in acts that would otherwise be unlawful if committed by ordinary citizens. And, contrary to Hasan's contentions, there is no need for law enforcement officers to have specific statutory authorization, as is present here, in order for those officers lawfully to engage in acts during the course of their official duties that would otherwise amount to criminal conduct.

[9]

(1st Cir. 1993), an undercover agent had supplied a criminal target with a "sample" of 13.3 grams of heroin (approximately 2,500 street doses) and this heroin was never recovered by law enforcement authorities. There, as here, the defendant raised an outrageous conduct argument, focusing on the fact that the government had provided a criminal target with a substantial amount of narcotics and then, as Hasan would say, "let it walk." The First Circuit flatly rejected this argument, specifically noting that "courts generally have declined to find outrageous misconduct in situations of this sort despite the disappearance of fairly substantial quantities of government supplied contraband."[10] *Id.* at 5 (citations omitted). In support of this conclusion, the First Circuit sensibly recognized that the unique demands of undercover narcotics operations create situations where the government must necessarily supply contraband to targets in order to gain their trust and confidence. *Id.; see also United States v. Milam,* 817 F.2d 1113, 1116 (4th Cir. 1987) (noting that "the practicalities of law enforcement sometimes compel officers to provide supplies to drug manufacturing operations, or even to supply 'contraband itself'). These same demands are present, of course, in undercover operations such as the one involved here, specifically targeted at investigating and apprehending individuals involved in the unlawful possession and distribution of contraband cigarettes. Thus, contrary to Hasan's contentions, the fact that the ATF agents allowed Hasan and other co-conspirators to "walk away" with untaxed and unstamped cigarettes does not render the agents' conduct outrageous in any respect or provide a basis for dismissal of the indictment.[11] And, this is especially true given the important

---

[10] *See, e.g., United States v. Valona,* 834 F.2d 1334, 1344-45 (7th Cir. 1987) (holding no misconduct where the government disbursed a 3.5 gram sample of cocaine while negotiating sales aggregating up to 35 kilograms); *United States v. Buishas,* 791 F.2d 1310, 1314 (7th Cir. 1986) (holding no government misconduct when agents disbursed a 69-gram sample of marijuana).

[10]

distinction between the government's undercover distribution of illegal narcotics, as involved and deemed constitutionally permissible in *Santana*, and contraband cigarettes, which, apart from being untaxed and/or unstamped, are otherwise legal commodities.[12]

It is also important to note that the mere length of the undercover ATF operation, by itself, does not render the operation outrageous, as Hasan argues. Not surprisingly, Hasan has failed to identify a single case in support of this particular argument. Federal investigations into large-scale criminal enterprises frequently take several years to complete, and courts have accordingly rejected claims of outrageous government conduct in cases involving undercover operations lasting even longer than the one involved here. *See, e.g., Goodwin*, 854 F.2d at 35-36 (upholding a reverse sting child pornography investigation spanning more than three years). Here, not only was the length of the undercover ATF operation not outrageous, as Hasan contends, but it was completely reasonable and necessary to allow the ATF adequate time to

---

[11] Moreover, the fact that the government may have profited from the undercover ATF investigation in this instance also does not render the operation outrageous in any respect, as Hasan appears to suggest. To the contrary, not only are such profits inevitable in the operation of an undercover business, as involved here, but they are also expressly anticipated and authorized by the applicable federal regulations. *See supra* note 8. The government also correctly notes that allowing the ATF to use profits made during the course of an undercover operation to offset the reasonable and necessary expenses of the operation serves to "minimize taxpayer expenses associated with long term investigations." Gov't Br. at 11 n.2 (noting that "[t]his authority is commonly known as 'Churning Authority' and it allows the Department of Justice to minimize taxpayer expenses associated with long term investigations").

[12] Hasan contends that tobacco cigarettes, although they are typically legal for purchase (depending on age), should be viewed and treated the same as narcotics and other controlled substances because cigarettes "are exceedingly dangerous and hazardous to human life." Def. Mot. at 13. Hasan also suggests that cigarettes are actually more pernicious than narcotics and other controlled substances, as evidenced by, *inter alia*, cigarette-related health and fatality statistics. Of course, Hasan's observations and arguments in this regard are essentially immaterial to the instant analysis, as they present policy-related matters that are more appropriately raised with Congress and the applicable state legislative branches, rather than in the context of a federal criminal prosecution.

determine the full scope and extent of the subject conspiracy, as well as to identify all of the various members and financiers of the conspiracy and learn their respective roles.

In sum, therefore, no aspect of the undercover ATF investigation and operation involved in this case was either outrageous or "shocking []or offensive to traditional notions of fundamental fairness" so as to warrant the extraordinary remedy of dismissal of the instant indictment. *Goodwin,* 854 F.2d at 37.[13] Nor do the circumstances presented here warrant exclusion or suppression of the evidence against Hasan in any respect. To the contrary, it is well settled that the "exclusionary rule" — on which Hasan relies — is generally reserved to serve as a remedy for violations of <u>specific</u> constitutional rights, rather than broad generalized rights as presented here. *See, e.g., United States v. Hensel,* 699 F.2d 18, 30-31 (1st Cir. 1983) (noting that the exclusionary rule "was not fashioned to vindicate a broad generalized right to be free of agency action not authorized by law but rather to protect certain specific, constitutional rights of individuals"). Indeed, the Supreme Court first adopted the federal exclusionary rule in *Weeks v. United States,* 232 U.S. 383 (1914) as a remedy for a specific violation of the Fourth Amendment — in that case the unlawful seizure of evidence from a home without a warrant. Not only has the Supreme Court since "caution[ed] against expanding [the exclusionary rule]," *Colorado v. Connelly,* 479 U.S. 157, 166 (1986), but it has also "repeatedly emphasized that the

---

[13] In a two-page supplemental brief, Hasan also appeared to request dismissal of the indictment on the ground that the government had engaged in "selective prosecution" in this matter. That argument is clearly meritless, as the doctrine of selective prosecution has absolutely no application to the facts presented here. To the contrary, the Fourth Circuit has recognized that "[t]o establish a selective-prosecution claim, a defendant must demonstrate that the prosecution 'had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Olvis,* 97 F.3d 739, 743 (4th Cir. 1996). And, to do so, a defendant must "establish both (1) that 'similarly situated individuals of a different race were not prosecuted,' . . . and (2) that the decision to prosecute was 'invidious or in bad faith." *Id.* (citations omitted). No such allegations of race-based discrimination are presented in the instant case and Hasan's selective prosecution argument must be flatly rejected.

[12]

rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998). Hasan — who here alleges only a violation of a broad generalized right rather than a specific constitutional right — has clearly failed to meet the significant burden required to warrant application of the federal exclusionary rule.

### III.

For all of the foregoing reasons, Hasan's motion to dismiss the indictment based on alleged outrageous government conduct, or alternatively to exclude the evidence against him, must be denied.

An appropriate Order has already issued.

Alexandria, VA
February 29, 2012

/s/
T. S. Ellis, III
United States District Judge